# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 23-0378V

| | |
|---|---|
| JOAN BARCLAY,<br><br>    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>    Respondent. | Chief Special Master Corcoran<br><br>Filed: September 17, 2025 |

*Jonathan Joseph Svitak*, Shannon Law Group, P.C., Woodridge, IL, for Petitioner.

*Rachelle Bishop*, U.S. Department of Justice, Washington, DC, for Respondent.

**FINDINGS OF FACT AND RULING ON ENTITLEMENT**[1]

On March 16, 2023, Joan Barclay filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a right shoulder injury related to vaccine administration ("SIRVA") from an influenza ("flu") vaccine received on October 19, 2021. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons set forth below, I find that the onset of Petitioner's pain more likely than not occurred within 48 hours of her vaccination, and that she has otherwise satisfied

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

the requirements of a Table SIRVA claim. Therefore, Petitioner is entitled to compensation under the Vaccine Act.

## I.     Relevant Procedural History

On December 18, 2023, Respondent filed his Rule 4(c) Report contesting Petitioner's entitlement to compensation because "Petitioner's record evidence does not establish that her pain began within forty-eight hours of vaccination." Rule 4(c) Report at 7. Petitioner then filed a Motion for Ruling on the Record ("Mot.") on March 14, 2024. ECF No. 26. Respondent filed a response ("Resp.") on April 1, 2024 and Petitioner filed a reply ("Repl.") on April 8, 2024. ECF No. 27-28.

The matter is now ripe for adjudication.

## II.    Relevant Facts

### A. Medical Records

Petitioner received a flu vaccine in her right arm on October 19, 2021. Ex. 5 at 2. Years before (in 1999), she had suffered a right shoulder injury which required surgery. Ex. 1 at ¶7. But she experienced a full recovery with no pain or limitations thereafter. *Id*. At the time of her vaccination, Petitioner was receiving physical therapy for her right knee and lower back. Ex. 4 at 119-169.[3]

Twelve days after her vaccination, Petitioner visited urgent care for Covid-19 testing due to an acute upper respiratory illness. Ex. 3 at 22. She followed up with her primary care provider ("PCP") the following day and was prescribed medication. Ex. 9 at 39.

Petitioner returned to urgent care one month later, on December 1, 2021, with complaints of indigestion and chest pain. Ex. 3 at 17-18. She again followed up with her PCP on December 16 and December 30, 2021, regarding high blood pressure, which was discovered during the evaluation of her chest pain. Ex. 9 at 33, 36. These PCP records do not contain any references to shoulder pain.

On March 31, 2022 - now approximately five and a half months after vaccination - Petitioner saw her PCP to follow up on her high blood pressure, and also reported "continued complaint of right shoulder pain and decreased range of motion since receiving the flu vaccine in October." Ex. 9 at 30-32. She noted that her pain had worsened and was impacting her activities of daily living. *Id*. at 32. On exam, she had tenderness and limited range of motion. *Id*. at 33. Petitioner was prescribed a Medrol

---

[3] Between her vaccination and her first treatment, Petitioner had 15 physical therapy treatments. *See* Ex. 4 at 179-246. None of these records document any shoulder pain.

dosepak and referred for an MRI. *Id*. The MRI revealed a labral tear with fraying, biceps tendinopathy, capsular thickening, subscapularis tendinopathy with a low-grade tear, and acromioclavicular ("AC") joint arthrosis. Ex. 7 at 3-4.

Petitioner returned to her PCP on April 28, 2022 with worsening right shoulder symptoms. Ex. 9 at 28-30. She reported that "even simple motions are now painful." *Id*. at 29. She was diagnosed with adhesive capsulitis and referred to an orthopedist. *Id*. at 30.

Petitioner was evaluated by an orthopedist on May 13, 2022. Ex. 6 at 3. She reported "R shoulder pain since October 2021 after flu shot." *Id*. She had pain with range of motion and positive impingement signs. *Id*. at 4. She was diagnosed with adhesive capsulitis and arthralgia of the right AC joint, prescribed another Medrol dosepak, and referred to physical therapy. *Id*.

On May 18, 2022, Petitioner had an initial physical therapy evaluation for her right shoulder. Ex. 4 at 15. She reported that "she had the flu shot in October 2021 and since the shot she was having increased pain in the shoulder." *Id*. She stated that she "consulted with her PCP back in December, who reportedly told her that it could be a side effect and it should subside." *Id*. She continued that "after 5 months, the pain was not subsiding." *Id*. On her intake form, Petitioner reported the onset of her pain as "10/21." *Id*. at 268. Petitioner attended 29 physical therapy treatments through September 23, 2022. *Id*. at 3-118. Upon discharge, Petitioner continued to have general soreness and marginal deficits in range of motion. *Id*. at 116.

From November 10 through December 21, 2022, Petitioner had six sessions of acupuncture treatment with an acupuncturist who then retired. Ex. 8 at 1-6. Beginning in March 2023, she returned to acupuncture treatment with a new therapist. Ex. 10 at 9. She reported that her chief complaint was "frozen shoulder since October 2021 post flu vaccination." *Id*. She had a total of 18 sessions through September 28, 2023. *Id*. at 9-15.

### B. Witness Testimony

Petitioner filed two declarations in support of her claim. Ex. 1, 11. Petitioner described her career as a registered nurse, working at a pediatrics practice for the past 17 years. Ex. 1 at ¶1. Petitioner stated that, although she did not experience unusual pain at the time of vaccination, "over the course of the next few hours, [her] right shoulder began to hurt." Ex. 11 at ¶1. By the next day, she stated, her shoulder was "stiff, and [she] was having trouble lifting it above [her] head." *Id*.

Petitioner explained that, as a nurse, she expected any pain after her vaccination to go away with time. Ex. 11 at ¶1. She stated that she believed her medical training would allow her to "self-treat the injury without the need to seek formal treatment." Ex. 1

3

at ¶10; Ex. 11 at ¶1. Petitioner stated that she mentioned her shoulder pain to her PCP during her visit on December 16, 2021 and recalled being advised that "it would probably get better with time." Ex. 1 at ¶11, Ex. 11 at ¶5. She decided to wait and see if [her] right shoulder would improve on its own." *Id*. She stated that she continued to "use over the counter medications and perform daily stretched and massages to try to alleviate the pain." Ex. 11 at ¶12.

Petitioner noted that she did not mention her shoulder pain during the physical therapy sessions addressing her knee and back pain because she "knew, as a nurse, that [she] would likely need a referral for them to work on [her] right shoulder, and [she] was still hopeful that the pain would go away without the need for physical therapy." Ex. 11 at ¶6. She also explained that she did not mention her shoulder pain at urgent care for her Covid-19 testing on October 31, 2021 and for chest pain on December 1, 2021, or at her PCP visit on November 1, 2021, because those were acute issues that needed to be focused on at the time. Ex. 11 at ¶2-4.

### III.    Applicable Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove by a preponderance of the evidence the matters required in the petition by Vaccine Act Section 11(c)(1). The Vaccine Act also requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Vaccine Act §11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. §13(a)(1)(A). "[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v.*

5

*Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### IV.     Findings of Fact – Onset

Respondent argues that "Petitioner's record evidence does not establish that her pain began within forty-eight hours of vaccination." Resp. at 10. He notes that "Petitioner did not report any shoulder pain until five and a half months" after her vaccination. *Id.* But mere delay alone does not defeat a favorable onset finding (although it is highly relevant to damages – and will be in this case).

Respondent also maintains that Petitioner had ample opportunity to report shoulder issues at the numerous medical appointments, both with doctors and physical therapists, she attended during that pre-treatment gap. Resp. at 10-11. In Respondent's view, "it would have been appropriate and expected that she raise shoulder pain or dysfunction if present" during her two urgent care visits and three visits with her PCP. *Id*. at 10. The record establishes, however, that Petitioner's visits to urgent care were for an acute upper respiratory illness and chest pain. Ex. 3 at 17-18, 22. Then, Petitioner followed up with her PCP after each – addressing her acute illness on November 1, 2021, and then high blood pressure discovered as a result of evaluation of her chest pain on December 16 and 30, 2021. Ex. 9 at 33, 36, 39. And Petitioner has explained that she did not mention her shoulder pain at the November visit due to being ill, and her belief that she could self-treat her injury at first. Ex. 11 at ¶3.

In addition, Petitioner contends that she did, in fact, mention her shoulder pain to her PCP at the December 16, 2021 visit, but was told that it should resolve with time. Ex. 11 at ¶5. This statement is corroborated both by the record of her March 13, 2022 visit with her PCP (where is was recorded that her complaint of shoulder pain "continued") and by the record of her initial physical therapy evaluation (where it was recorded that Petitioner spoke to her doctor about her shoulder pain in December). *See* Ex. 4 at 15; Ex. 9 at 32. Because Petitioner had received reassurance from her doctor two weeks prior, it is reasonable to conclude that she did not mention her shoulder pain again at the December 30, 2021 visit. Petitioner also provided a reasonable explanation for why she did not mention her shoulder pain to her physical therapists, who were addressing other musculoskeletal problems - she "knew, as a nurse, that [she] would likely need a referral for them to work on [her] right shoulder, and [she] was still hopeful that the pain would go away without the need for physical therapy." Ex. 11 at ¶6.

Respondent notes that Petitioner was seeking care for musculoskeletal issues for which she "more immediately sought medical intervention.," suggesting that if she had

6

shoulder pain she would addressed it promptly. Resp. at 11. He relies on the fact that prior to her vaccination, Petitioner sought treatment for knee and lower back pain, and was engaged in physical therapy treatment for both. *Id*. But, Petitioner injured her knee getting onto a boat, which caused a "shooting pain" and difficulty walking and had long-term back problems that "recently increased in intensity."[4] Ex. 4 at 119, 169. In contrast, Petitioner stated that she relied on her experience as a nurse to conclude that her post-vaccination pain was likely to subside with time. Ex. 1 at ¶10; Ex. 11 at ¶1. Petitioner also stated that she mentioned her shoulder pain to her doctor on December 16, 2021, and was told that it would resolve on its own – advice upon which she relied until her pain "gradually worsened." Ex. 1 at ¶11; Ex. 11 at ¶5, 7.

Respondent further contends that the medical records from the intervening appointments affirmatively "refute the presence of an acute shoulder injury," because they include exam findings reflective of normal range of motion or negative review of systems for joint pain. Resp. at 12. However, a review of those records undercuts Respondent's arguments. For example, Petitioner's urgent care visit on October 31, 2021 (cited by Respondent) includes only cervical spine range of motion in the examination notes and does not mention Petitioner's shoulder. Ex. 3 at 25. Further, Petitioner's PCP records contain almost identical "review of systems" recitations across numerous visits. *See e.g.* Ex. 4 at 35, 38, 40. When Petitioner did formally see her PCP for shoulder pain, his notation of her complaints appear in bold in the review of systems, suggesting that changes to the form are highlighted in that way. *See id.* at 32.

Finally, Respondent argues that there is no evidence in the record (other than Petitioner's statements) that place onset of her pain within the 48 hours after her vaccination. Resp. at 13. He highlights the fact that Petitioner reported pain vaguely, as beginning "since" or "after" her vaccination. *Id*. However, it is common for medical records to contain similar general statements as to onset, which are then explained in sworn testimony that provides additional detail. *See e.g. Ogea v. Sec'y of Health & Human Servs.*, No. 22-0025V, 2025 WL 1752390 at *5 (Fed. Cl. Spec. Mstr. May 20, 2025) ("[T]he simple fact that she did not state a specific time of onset does not defeat her Table claim."). Here, Petitioner's sworn statements do not contradict the notation in her records of pain "since" or "after" her vaccination, but provide detail as to the specific timing of onset "a few hours" after her flu shot. Ex. 11 at ¶1. Further, other than Petitioner's delay in seeking treatment, there is no evidence in this record supporting the conclusion that onset of her pain began *more* than 48 hours post-vaccination.

---

[4] Respondent states that Petitioner had an MRI before starting therapy for her back pain, but the record does not indicate when during Petitioner's years-long back pain the MRI was performed. *See* Ex. 4 at 169.

7

Accordingly, I find there is preponderant evidence to establish the onset of Petitioner's pain occurred within 48 hours of vaccination.

## V.      Ruling on Entitlement

### A.      *Requirements for Table SIRVA*

I have found that Petitioner has preponderantly established that her pain began within 48 hours of her vaccination. 42 C.F.R. § 100.3(c)(10)(ii). Respondent has not contested Petitioner's proof on the remaining elements of a Table SIRVA. *See* 42 C.F.R. § 100.3(c)(10)(i),(iii-iv). Accordingly, I find that Petitioner has provided preponderant evidence to establish that she suffered a Table SIRVA injury.

### B.      *Additional Requirements for Entitlement*

Because Petitioner has satisfied the requirements of a Table SIRVA, he need not prove causation. Section 11(c)(1)(C). However, she must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

The vaccine record shows that Petitioner received a flu vaccine on October 19, 2021. Ex. 5 at 2; Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). Additionally, Petitioner has stated that she has not filed any civil action or received any compensation for her vaccine-related injury, and there is no evidence to the contrary. Ex. 1 at ¶25-26; Section 11(c)(1)(E) (lack of prior civil award). Finally, Petitioner's medical records reveal that she suffered the residual effects of her vaccine injury for more than six months, and Respondent does not argue otherwise. *See* Ex. 4 at 9-15; Ex. 6 at 3; Ex. 7 at 3-4; Ex. 9 at 28-30; Section 11(c)(1)(D)(i) (statutory six-month requirement). Therefore, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation in this case. A separate damages order will be issued.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master